J-A16036-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MATTHEW 2535 PROPERTIES, LLC | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD E. DENITHORNE AND | : | |
| PRISCILLA F. DENITHORNE | : | |
| | : | |
| Appellant | : | No. 285 EDA 2022 |

Appeal from the Judgment Entered March 4, 2022
In the Court of Common Pleas of Carbon County Civil Division
at No(s):  18-1411

BEFORE:    McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:                **FILED JANUARY 26, 2023**

Richard E. and Priscilla F. Denithorne (Sellers) appeal from the judgment entered against them, following a non-jury trial, in the Carbon County Court of Common Pleas, directing, with certain conditions, specific performance of the agreement of sale (Agreement) for commercial property entered into with Matthew 2535 Properties, LLC (Buyer).  Sellers argue, *inter alia*, the trial court erred in finding they breached the Agreement.  We agree and thus reverse.

## I.  Facts

Sellers, who are husband and wife, own the underlying commercial property (the Property), at 845 Interchange Road, Lehighton, in Carbon County.  Their adult children, Vincent, Michael, and Dave, have a corporation,

---

[*] Retired Senior Judge assigned to the Superior Court.

Denithorne Brothers, Inc. (Denithorne Brothers), which operated a restaurant, Trainer's Inn, on the Property. Additionally, there was a smaller building behind the restaurant. N.T. Non-Jury Trial, 6/2/20, at 25. Catherine Jaindl-Leuthe is the sole member of Matthew 2535 Properties LLC; for ease of discussion, we will refer to them both together generally as "Buyer." Sometime in 2017, the restaurant closed. *Id.* at 45.

On January 13, 2018, Sellers and Buyer entered into an agreement of sale for the Property, with an agreed-upon sale price of $400,000. Both parties agree the restaurant "needed work," and Buyer intended to spend $500,000 to $600,000 for major repairs and renovations. N.T. at 29, 32, 74.

Pertinently, the Agreement included the following risk-of-loss clause:

> 16. **Risk of Loss/Condemnation:** Seller shall bear all risk of loss until Closing, and shall deliver the Property in its current condition as of this date. Seller shall coordinate any remediation of casualty with Buyer or arrange for the provision of the funds for remediation at Closing and may leave the Property in its damaged condition if the proposed insurance settlement is acceptable to Buyer. The parties shall cooperate and coordinate any remediation or assignment of proceeds to achieve the desired result of the Buyer **without added cost to Seller**. . . .

Agreement of Sale, 1/13/18, at 7 (emphasis added). The Agreement also stated, with regard to default:

> 20. **Default:** . . . Seller acknowledges that the remedies to Buyer and Seller are different, since Buyer is investing substantial time and effort and funds of the intended investigation, design and other work contemplated herein. If Seller shall default, then Buyer or its assign, shall be entitled to a return of the Deposit paid and may file a lis pendens and seek Specific Performance.

*Id.* at 8.

The Agreement further provided the following: closing was scheduled for April 30, 2018, but Buyer had the option to extend closing, twice, for 30 days. Additionally, closing was contingent upon the closing of two separate sale agreements, between Ms. Jaindl-Leuthe's second company, Good Spirits 845, LLC (Good Spirits), and: (1) Sellers for the contents of the restaurant, including equipment and inventory, for $35,000; and (2) Denithorne Brothers, for the restaurant's liquor license for $15,000. *See* Agreement of Sale at 5; N.T. at 13. Accordingly, both Buyer and Sellers considered the "entire transaction" to be worth $450,000. *Id.* at 13, 50, 61.

On March 17, 2018, two months after the execution of the Agreement, the restaurant was destroyed by a fire. The first floor "was smashed into the cellar." N.T. at 16. The parties stipulated the cause of the fire was not determined. *Id.* at 3. Sellers did not carry insurance on the Property, although non-party Denithorne Brothers did. Despite Buyer's desire to proceed to closing with remediation of the Property, Sellers did not attend the closing.

## II. Non-Jury Trial & Verdict

On July 6, 2018, Buyer filed the underlying complaint, seeking specific performance of the Agreement and, in the alternative, averring breach of contract. This matter proceeded to a non-jury trial on June 2, 2020.

Ms. Jaindl-Leuthe testified to the following. She believed that under the "risk of loss" paragraph of the Agreement, Sellers would either purchase

insurance or be self-insured. N.T. at 27-28. After the fire, she "attempt[ed] to continue forward toward closing," and believed Sellers would contact her to work out either remediation of the Property or transferring the Property with funds to "take the [P]roperty back to" its prior condition. *Id.* at 16, 18. Buyer's attorney "made several contacts" to Sellers' attorney, but received no response. *Id.* at 18, 28-29. Buyer also exercised the two options to extend the time for closing. *Id.* at 14. Meanwhile, two weeks after the fire, Denithorne Brothers notified Buyer it was canceling the transfer of the liquor license.[1] *Id.* at 21.

Finally, Buyer's attorney sent a letter to Sellers, requesting they proceed to closing on June 29, 2018. N.T. at 19. This letter stated that because Buyer had not received requested information about insurance proceeds, it would place the amount of the sale price in escrow. *Id.* at 38. Buyer also waived some "pre-conditions to the closing," including receipt of the liquor license. *Id.* at 19. However, Sellers did not attend the closing. *Id.* The relief that Buyer desired was the transfer of the Property, with either Sellers' funds to remediate the Property or "insurance proceeds" assigned to her, in exchange for the sale price of $400,000.[2] *Id.* at 42-43.

---

[1] This letter was signed by Seller Priscilla in her capacity as president, secretary, and treasurer of Denithorne Brothers.

[2] On cross-examination, Ms. Jaindl-Leuthe testified that in December of 2017 — one month before the signing of the Agreement — St. Luke's Hospital
*(Footnote Continued Next Page)*

Buyer next called Sellers Richard and Priscilla as if on cross-examination. Priscilla testified to the following: Richard worked at a steel company for 43 years, and she also worked there for seven or eight years, before going to work at the restaurant "one or two days." N.T. at 65. However, she "never got a paycheck from the restaurant and didn't want one." *Id.* Instead, Sellers helped their sons by getting "them started without debt[.]" *Id.* at 64. Their son Dave paid all the operating expenses of the restaurant. *Id.* at 73.

As stated above, Sellers did not maintain insurance on the Property. N.T. at 54. However, after the restaurant closed in 2017, they paid the insurance premiums for the policy held by Denithorne Brothers.[3] N.T. at 46, 64. Sellers insisted those insurance proceeds would go to Denithorne Brothers, not Sellers. *Id.* at 55, 64. Richard also stated that the original total sale proceeds of the transactions, $450,000, would have gone to their sons, not Sellers. *Id.* at 55. Richard expected that presently, Buyer should pay the

_____

contacted her about buying a nearby property she owned, it "was looking to [build] a hospital in the Lehighton area." N.T. at 34-36. Priscilla testified she and Richard did not know about these hospital's plans. *Id.* at 63. Sellers argued that Buyer's having this information was relevant, as the presence of a hospital would increase the value of the Property. *Id.* at 35. However, on appeal, Sellers do not present any argument concerning the hospital.

[3] Priscilla stated they paid an insurance premium one time. N.T. at 64.

- 5 -

original total amount of $450,000 and in exchange, receive the Property in its current condition.[4] *Id.* at 58.

On July 9, 2021, the trial court entered the underlying judgment in favor of Buyer and ordered specific performance of the Agreement. The court directed Sellers to transfer the Property to Buyer for $400,000, "minus the amount of insurance proceeds paid to Denithorne Brothers . . . for the loss of the restaurant structure, excluding therefrom any amount paid for the loss of equipment and inventory contained within the structure." Verdict, 7/9/21, at 17.[5] Pertinently, the trial court found: (1) the Agreement required Sellers to deliver the Property in its condition as of the date the Agreement was made; and (2) Sellers' failure to do so was a breach of the Agreement. Memo. Op., 7/9/21, at 11-12.

Sellers filed a timely post-trial motion, which was denied on December 23, 2021, and judgment was entered in favor of Buyer on March 4, 2022. Sellers took a timely appeal and complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

---

[4] Sellers also testified that after the fire, they received an offer for both the Property and liquor license for $375,000. N.T. at 75- 76.

[5] The trial court issued one document, containing both a memorandum opinion and verdict, with continuous pagination. Thus, the two-page verdict appears as pages 16 and 17 of the filing entitled, "Memorandum Opinion."

### III.  Statement of Questions Involved

Sellers present the following issues for our review:

A.  Whether the lower court erred in determining that Sellers breached the Agreement of Sale where the Agreement provided that in the event of a loss, the Sellers were only obligated to coordinate remediation if they could do so without added cost to themselves?

B. Whether the lower court erred in determining that Sellers breached the Agreement of Sale where the Agreement provided that settlement was to occur on or before June 30, 2018, but Buyers refused to proceed with the sale on or before that date?

C. Whether the lower court erred in granting specific performance where the order led to an inequitable result and failed to properly assess the value of the Property?

D. Alternatively, whether the lower court erred in valuing the Property as the purchase price less "the amount of insurance proceeds paid to Denithorne Brothers, Inc. for the total loss of the restaurant structure, excluding therefrom any sum paid by the insurance company for the loss of personal property contained within the restaurant" where the only evidence submitted at trial was that the Property's post-fire value was $375,000?

Sellers' Brief at 1138-39 (citation omitted).

### IV.  Standard of Review & Relevant Law

Preliminarily, we consider the relevant standard of review and guiding principles in contract law:

> The interpretation of any contract is a question of law and this Court's scope of review is plenary.  [W]e need not defer to the conclusions of the trial court and are free to draw our own inferences.  In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement.  . . .

To prove a breach of contract, a party must establish the following: "(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract, and (3) resultant damages."

***Gamesa Energy USA, LLC v. Ten Penn Ctr. Assocs., L.P.***, 181 A.3d 1188, 1192 (Pa. Super. 2018) (***Gamesa Energy***) (citations omitted).

With respect to specific performance, this Court has explained:

[A] request for specific performance is an appeal to the court's equitable powers. . . . "A decree of specific performance is not a matter of right, but of grace." Such a decree will be granted only if a plaintiff clearly is entitled to such relief, there is no adequate remedy at law, and the trial court believes that justice requires such a decree. . . .

Courts in this Commonwealth consistently have determined that specific performance is an appropriate remedy to compel the conveyance of real estate where a seller violates a realty contract and specific enforcement of the contract would not be contrary to justice.[ ]

***Oliver v. Ball***, 136 A.3d 162, 166-67 (Pa. Super. 2016) (citations omitted).

## V. Breach of Contract

In their first issue, Sellers aver the trial court erred in finding they breached the Agreement. For ease of review, we first set forth the trial court's reasoning. It found the following: the phrase in the risk-of-loss paragraph, "without added cost to Seller," was ambiguous because the parties had different understandings of this term.[6] Memo. Op. at 10. Buyer believed the

---

[6] On appeal, Sellers do not challenge this finding — that this Agreement term was ambiguous. ***See Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.***, 905 A.2d 462, 469 (Pa. 2006) ("While unambiguous contracts are interpreted
*(Footnote Continued Next Page)*

term meant Sellers would either purchase insurance or remediate the Property themselves should a casualty occur. *Id.* On the other hand, Sellers believed "the term protected them from any liability for loss other than the amount of insurance proceeds, **if any existed**," and specifically, they were not required to perform any remediation. *Id.* at 10, 11 (emphasis added). Nevertheless, the Agreement is clear that Sellers were required "to deliver the [P]roperty to [Buyer] 'in its current condition' as of January 13, 2018," the date the Agreement was executed. *Id.* at 11-12. The trial court concluded that because Sellers failed to deliver the Property in this condition, they were in breach. *Id.* at 12.

On appeal, Sellers assert the following: they acknowledge the Agreement required them to bear the risk of loss, but emphasize the Agreement also provided that in the event of a loss, they "were only obligated to coordinate remediation if they could do so without added cost to themselves." Sellers' Brief at 14. Under the plain language of the Agreement, their "maximum exposure in the event of loss would be the amount, **if any**, of their insurance proceeds." *Id.* (emphasis added). Sellers claim it was undisputed they could not coordinate remediation without added cost, as they did not carry insurance on the Property. *Id.* at 15. Sellers acknowledge their

_____

by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.").

sons received insurance compensation, but maintain it was payable to the sons, not Sellers. *Id.* After careful review, we agree that Sellers were not in breach of the Agreement.

We review the following: Sellers agreed to sell the Property in as-is condition for $400,000. Buyer was also in agreement, with the understanding it would need to undertake major renovations at an estimated cost of $500,000 to $600,000. N.T. at 30-32. As stated above, the Agreement provided:

> . . . Seller shall bear all risk of loss until Closing, and shall deliver the Property in its current condition as of this date.
>
> Seller shall coordinate any remediation of casualty with Buyer or arrange for the provision of the funds for remediation at Closing and may leave the Property in its damaged condition if the proposed insurance settlement is acceptable to Buyer. The parties shall cooperate and coordinate any remediation or assignment of proceeds to achieve the desired result of the Buyer **without added cost to Seller**. . . .

Agreement of Sale at 7 (paragraph break & emphasis added).

Although the above clause contemplates that remediation **could** come from the proceeds of an insurance policy, the plain language of the Agreement does not require either party to procure a policy of insurance to cover loss. Buyer does not allege, and the trial court did not find, that Sellers' lack of an insurance policy was a breach of the Agreement. *See* Buyer's Brief at 14 ("In this instance, [Sellers] elected not to shift [the risk of loss] to an insurance company, but rather maintained that risk themselves.").

The parties do not dispute the meaning of the first sentence of the contract provision: "Seller shall bear all risk of loss until closing, and shall deliver the Property in its current condition as of this date." **See** Agreement of Sale at 7. However, while the Agreement requires the parties to negotiate an acceptable settlement from any available insurance proceeds, the agreement includes a separate proviso that under no circumstances would Sellers be required to remediate at a personal loss to themselves. Buyer ignores this provision — "without added cost to Seller" — in maintaining Sellers were bound by the Agreement to either remediate the property to its prior condition or "provide[ ] the funds necessary to remediate the Property." **See** Buyer's Brief at 9.

The parties did not reach any agreement as to a reduced purchase price for the fire-ravaged structure. As the Agreement does not require Sellers to obtain an insurance policy, nor to remediate the damage without additional costs to themselves, we conclude Sellers did not breach the plain terms of the Agreement.[7] **See Gamesa Energy**, 181 A.3d at 1192. Rather, in the event the parties could not reach a mutually agreeable reduced sales price, each

---

[7] In light of this holding, we do not reach Sellers' claim that it was Buyer who breached the Agreement.

party was free to either proceed to close on the property as-is or simply walk away from the deal.[8]

We acknowledge that after the execution of the Agreement, Buyer undertook preparations for the purchase of the Property. Ms. Jaindl-Leuthe testified she filed documents with, and met with, the Pennsylvania Liquor Control Board in connection with the liquor license. N.T. at 14-15. She also arranged a sewer or septic inspection and building inspection, and engaged an architect. *Id.* at 15. Nevertheless, to the extent the risk-of-loss terms were disadvantageous to Buyer's interests, we note it was represented by an attorney, and "we are interpreting a negotiated commercial contract between sophisticated business people who had the ability to control, decide and design remedies for breach."[9] *See Newman Dev. Grp. of Pottstown, LLC v.*

_____

[8] We note the latter part of the Agreement's risk-of-loss clause provided:

> In the event of a condemnation of any part of the Premises **or the termination of any presently used or permitted or existing access to the Premises**, Buyer may: (i) terminate this Agreement and receive a full refund of the Deposit and interest if Buyer shall so elects, in which event there shall be no further rights or obligations in either party; or (ii) proceed to Closing and receive an assignment from Seller of the condemnation proceeds payable by reason of the condemnation in an amount not to exceed the Purchase Price.

Agreement at 7 (emphasis added).

[9] Buyer's attorney drafted the Agreement. N.T. at 11. *See Ins. Adjustment Bureau, Inc.*, 905 A.2d at 468 ("Under ordinary principles of contract

*(Footnote Continued Next Page)*

*Genuardi's Family Mkt., Inc.*, 98 A.3d 645, 659 (Pa. Super. 2014) (*en banc*). *See also* Memo. Op. at 10-11 (observing, "The Agreement could have mandated [Sellers'] purchase of insurance. Alternatively, the parties could have agreed on a more detailed procedure as to what should happen in the event of a casualty if [Sellers] chose not to insure the [P]roperty.").

In any event, as we determine Buyer did not establish that Sellers breached the Agreement, we further hold the trial court erred in granting specific performance. *See Oliver*, 136 A.3d at 166-67. We thus reverse the judgment entered in favor of Buyer.

## VI. Reduction of Sale Price as Ordered in Specific Performance

Although our disposition of Sellers' first claim may conclude our review, we briefly address Sellers' fourth claim, that in directing specific performance of transferring the Property, the trial court erred in directing the purchase price to be $400,000, less the amount of insurance proceeds paid to Denithorne Brothers. Sellers' Brief at 20.

---

interpretation, the agreement is to be construed against its drafter."). However, the Agreement provided:

> The parties have had an opportunity to discuss this Agreement with their attorneys and have both participated or had the ability to participate in drafting this [A]agreement and this Agreement shall not be construed against any party as the "drafter" based on rule or custom[.]

Agreement of Sale at 8.

The trial court acknowledged the Agreement clearly required Sellers to bear all risk of loss until closing.  Mem. Op. at 12.  The court then set forth the following reasoning:  the Agreement also clearly provided that in the event of loss, "[t]he parties shall cooperate and coordinate any remediation or assignment of proceeds . . . without added cost to Seller[s]."  *Id.* at 12.  Pursuant to this plain language, "the parties contemplated that [Sellers'] maximum exposure in the event of loss would be the amount of insurance proceeds paid as a consequence of such loss."  *Id.*  However, the court could not order Sellers to give the Denithorne Brothers' insurance proceeds to Buyer, because those proceeds were not paid to Sellers.  *Id.* at 14.  Nevertheless, the court found the most equitable remedy was to direct Buyer to purchase the Property for $400,000, less the amount of insurance proceeds paid to Denithorne Brothers, excluding any insurance sum paid for the loss of personal property.  *Id.*

On appeal, Sellers assert the trial court erred in imposing this valuation. They maintain the only evidence of the value of the Property was their own evidence, that another party offered, post-fire, $375,000 for the Property and liquor license.  We would agree with this discrete Seller's argument.

It is not disputed that the insurance policy was held by Denithorne Brothers, who is not a party to this lawsuit.  Sellers point out, without objection, that Buyer was not seeking to recover from Denithorne Brothers, Inc.  N.T. at 56.

The sole evidence at trial about the insurance proceeds was both Sellers' testimony that the proceeds would be paid to their children. ***See*** N.T. at 55, 64. There was no evidence about the amount of the insurance proceeds requested or actually received, nor the basis of the proceeds, *i.e.*, what the insurance proceeds were intended to reimburse Denithorne Brothers for and in what amounts.

In fact, the trial court precluded Buyer from eliciting testimony about the amount of the insurance payout. Buyer asked Richard whether he knew the amount of the insurance proceeds. N.T. at 55. Sellers objected on relevance grounds, arguing: (1) Buyer was not attempting to recover from Denithorne Brothers, Inc.; and (2) instead, Buyer was seeking "to remediate a property and the fact that somebody else has insurance money or how much that might be has no relevance to [Buyer's] claims." ***Id.*** at 56. The trial court **sustained** Sellers' objection and precluded Richard from testifying about the amount of the insurance paid to Denithorne Brothers. Furthermore, as stated above, there was no evidence as to basis for the insurance proceeds, *i.e.* what losses the insurance company meant to reimburse the policy holder for, and in what amounts. Accordingly, we would hold the trial court's inclusion of the insurance proceeds was speculative.

## VII. Conclusion

For the foregoing reasons, we conclude the trial court erred in finding Sellers breached the Agreement, entering judgment in Buyer's favor, and ordering specific performance. We thus reverse the judgment.

Judgment reversed. Jurisdiction relinquished.

Judge McLaughlin joins this Memorandum.

Judge Pellegrini files a Dissenting Memorandum.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 1/26/2023*